**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 6, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT
_____

THE HIGH LONESOME RANCH,
LLC,

      Plaintiff / Counterclaim
      Defendant - Appellant,

v.

THE BOARD OF COUNTY
COMMISSIONERS FOR THE
COUNTY OF GARFIELD,

      Defendant / Counterclaimant /
      Cross-Claimant - Appellee,

and

UNITED STATES OF AMERICA,
through its agency, the Bureau of Land
Management, a division of the United
States Department of Interior,

      Defendant / Cross-Claim
      Defendant - Appellee.

-------------------------------

PACIFIC LEGAL FOUNDATION;
COLORADO FARM BUREAU; NEW
MEXICO HABITAT CONSERVATION
INITIATIVE; ROCKY MOUNTAIN
FARMERS UNION; THE PROPERTY
AND ENVIRONMENT RESEARCH
CENTER; UTAH FARMERS UNION;
WESTERN LANDOWNERS
ALLIANCE; COLORADO

No. 21-1020

COUNTIES, INC.,

Amici Curiae.

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:17-CV-01260-RBJ-GPG)**

_____

Frederick R. Yarger (Ryan W. Cooke with him on the briefs), of Wheeler Trigg O'Donnell LLP, Denver, Colorado, for Plaintiff-Appellant.

Geoffrey P. Anderson of Anderson Notarianni McMahon LLC, Denver, Colorado (Joshua D. McMahon of Anderson Notarianni McMahon LLC, Denver, Colorado, and Tari L. Williams of Garfield County Attorney's Office, Glenwood Springs, Colorado, with him on the brief), for Defendant-Appellee.

Jeffrey W. McCoy of Pacific Legal Foundation, Sacramento, California, and Glenn E. Roper of Pacific Legal Foundation, Highlands Ranch, Colorado, filed an amicus brief for Pacific Legal Foundation and Colorado Farm Bureau.

Christopher O. Murray, Julian R. Ellis, Jr., and Sean S. Cuff of Brownstein Hyatt Farber Schreck, LLP, Denver, Colorado, filed an amicus brief for Western Landowners Alliance, Rocky Mountain Farmers Union, Utah Farmers Center, and New Mexico Habitat Conservation Initiative.

Andrew D. Ringel of Hall & Evans LLC, Denver, Colorado, filed an amicus brief for Colorado Counties, Inc.

_____

Before **MATHESON**, **EBEL**, and **PHILLIPS**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

We must resolve whether Garfield County, Colorado, has a right-of-way over two dirt roads within the county—North Dry Fork Road and Middle Dry Fork Road. The two roads run east to west across the property owned by the

2

High Lonesome Ranch, a conservation and livestock ranch offering hunting and outdoor-recreation services.

For years, the Ranch restricted access to the roads by locking a gate. But in 2015, during a county meeting, the Garfield County Commission directed the Ranch to remove the locked gate after concluding that the two disputed roads were subject to public rights-of-way. The Ranch refused and filed a declaratory-judgment action in Colorado state court opposing the County's position. At first, the County asked the state court to dismiss the case for failure to name the U.S. Bureau of Land Management ("BLM") as a party. But rather than dismissing, the state court ordered the Ranch to join the United States (BLM) as a necessary party, and the Ranch did so. The United States promptly removed the case to federal district court. In October 2020, after a five-day bench trial, the district court ruled that the entire lengths of the two disputed roads were subject to public rights-of-way. In doing so, the court relied on Colorado adverse-use law and Revised Statute 2477 ("R.S. 2477").[1]

On appeal—and for the first time—the Ranch contends that various procedural shortcomings deprived the district court of subject-matter

---

[1] In 1866, Congress passed an open-ended grant of "the right of way for the construction of highways over public lands, not reserved for public uses." *S. Utah Wilderness All. v. Bureau of Land Mgmt.* (*SUWA*), 425 F.3d 735, 739 (10th Cir. 2005) (citing Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, *codified at* 43 U.S.C. § 932, *repealed by* Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, § 706(a), 90 Stat. 2743, 2793). This statute is often called R.S. 2477. *See id.* (discussing history of R.S. 2477).

jurisdiction. It also challenges the district court's rights-of-way rulings. If it loses on those issues, the Ranch requests that we remand for more precise determinations of the County's rights-of-way. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's adverse-use ruling, but we reverse its R.S. 2477 ruling and remand for the court to reconsider that ruling under recent circuit authority governing acceptance of R.S. 2477 rights. We also remand for the district court to determine the locations and widths of the rights-of-way by survey.

## BACKGROUND

I.      Factual Background

A.      The Disputed Roads

North Dry Fork Road "runs east to west from [De Beque], Colorado, to the top of a ridgeline [above the] North Dry Fork Valley." *High Lonesome Ranch, LLC v. Bd. of Cnty. Comm'rs*, 508 F. Supp. 3d 801, 809 (D. Colo. 2020). As North Dry Fork Road (also called Dry Fork Road) heads west from De Beque, it splits into South Dry Fork Road and North Dry Fork Road (also known as County Road 200). *See id.* at 810. County Road 200 veers northwest from this split until it reaches a locked gate on the Ranch's property. *See id.* At this point, the road again becomes known as North Dry Fork Road. *See id.* It continues west until it forks again into North and Middle Dry Fork Roads. *Id.* The parties call this intersection "the Y." *Id.* Middle Dry Fork Road then runs southwest, and North Dry Fork Road continues northwest, then west, then

4

southwest, to the top of the ridgeline. *See id.* at 809–10. Only Middle Dry Fork

Road and the portion of North Dry Fork Road west of the gate are disputed.[2]

*See id.* Though North and Middle Dry Fork Roads mostly lie on the Ranch's

property, some scattered segments traverse BLM land. *See id.* at 810–11, 830;

Opening Br. 6–8. Dry Fork Road, South Dry Fork Road, and County Road 200

aren't at issue.

To help visualize the area, here is a map of the two disputed roads from

the district court's opinion:



*High Lonesome Ranch*, 508 F. Supp. 3d at 811. The white parcels are the

Ranch's, and the yellow parcels are BLM's. The hand-drawn "X" visible in

Section 27, Township 7 South, Range 99 West is the gate.

---

[2] Our opinion often refers to the disputed roads as "the roads" for simplicity. The opening brief's map labels the segment of North Dry Fork Road between the gate and the Y "Dry Fork Road." Opening Br. 7. Rather than muddying the labels, we'll stick with calling this segment North Dry Fork Road, as the district court did.

Until August 1882, the Dry Fork area—in which the Ranch is situated—was part of the Ute Indian Reservation. *Id.* at 813. But President Chester A. Arthur terminated the reservation then, making the lands available for public purchase and homesteading. *Id.* In 1885, the U.S. General Land Office ("GLO")—BLM's predecessor—surveyed the Dry Fork area. *Id.* Eli M. Ashley and Henry Simons separately surveyed the area on the government's behalf, *id.*, and their surveys were approved by the U.S. Surveyor General. The surveys show a trail along Middle Dry Fork Road. *Id.* But the surveys do not show North Dry Fork Road. *Id.*

In 1891, the federal government began issuing land patents in the Dry Fork area. *Id.* Throughout the early 1900s, the government continued issuing cash-entry patents and patents under the Homestead Act of 1862, the Mining Act of 1872, the Desert Land Act of 1877, and the Timber and Stone Act of 1878. *Id.*

Today, the Ranch owns nearly all the land and roadways along Middle and North Dry Fork Roads. *Id.* at 812. BLM manages between 50,000 and 90,000 acres of public land surrounding the Ranch's property. *Id.* Though the public can access the federal lands without using the Dry Fork Roads, that access is considerably more challenging. *Id.*

**B.    The Purchase of the High Lonesome Ranch**

In the 1990s and early 2000s, Paul Vahldiek purchased large tracts of land in the Dry Fork area. *Id.* at 812, 826. The High Lonesome Ranch LLC now

owns these lands. *Id.* at 812. Vahldiek is the founder and sole proprietor of the LLC and chairs its board of directors. *Id.* Vahldiek owns 63% of a 50% interest in the Ranch. *Id.* Today, the Ranch is run as a high-end recreation operation that offers hunting, fly-fishing, hiking, biking, and horseback riding. *Id.* It also offers luxury accommodations and meals. *Id.* And it engages in conservation efforts such as "improved grazing practices, regenerative agriculture, [and] non-interference with wildlife corridors," among other "positive land stewardship" strategies. *Id.*

The Ranch was formed from three separate land purchases: (1) the Hitchburn Property, (2) the Broadhead Property, and (3) the McKay Fork Ranch Property. *Id.* at 812, 826. In 1994, Vahldiek's company bought the Hitchburn Property. *Id.* at 826. A year later, his company purchased the Broadhead Property. *Id.* Before purchasing Broadhead, Vahldiek visited the area and saw that North Dry Fork Road traversed the property and that a locked gate blocked access about a mile east of the current gate. *Id.*; Appellant's App. vol. 3, at A546. Vahldiek had his attorneys investigate the title issues on the roadways. *High Lonesome Ranch*, 508 F. Supp. 3d at 826.

As part of buying Broadhead, Vahldiek had from December 22, 1994, to January 10, 1995, in which to obtain a title commitment and until January 16, 1995 (the closing date) to raise possible title issues. Appellant's App. vol. 3, at A578–79 ("Q. And then you had five days to make an objection [to title], correct? A. I believe so, yes."). Vahldiek raised no objections. *Id.* at 579 ("Q.

And you didn't make any objections to the title, did you? A. I think after conferring with counsel I don't recall that we did."). He similarly opted against having an inspection contingency (i.e., the right to rescind the purchase contract based on a future inspection). *Id.* at A580 ("Q. Okay. So you waived your right to inspect the property and call off the deal if you didn't like what the inspection showed, right? A. That would be, I think, a fair statement.").

In 2003, Vahldiek's company bought the McKay Fork Ranch (formerly known as the Beach Ranch). *High Lonesome Ranch*, 508 F. Supp. 3d at 826. Marketing materials for the McKay Fork Ranch stated that "County Road 220" ran from De Beque to the eastern boundary of the Ranch, at which point a private road continued eight miles across the Ranch. *Id.* Based on that information, Vahldiek concluded that the road crossing the property was private. *Id.*

## C.    The Present Dispute

The Ranch states that the County first claimed an R.S. 2477 right-of-way over North and Middle Dry Fork Roads in December 2015. The County based its right-of-way claim on alleged public use of the roads beginning in the 1880s. The County Commission met in December 2015 and directed the Ranch to unlock its gate and allow motorized traffic over the roads west of the gate. *High Lonesome Ranch*, 508 F. Supp. 3d at 830–31.

As we understand it, the Ranch at first agreed to the County's request. The County tells us that the parties met and discussed installing fencing, cattle

guards, and no-trespassing signs along the roads. In a March 2016 meeting, the parties identified where these items would be placed. But after the County began obtaining bids for the work, this litigation began.

## II.    Procedural Background

In April 2016, the Ranch sued the County in Colorado state court for a "declaration that the Road is not public." Appellant's App. vol. 1, at A34–35. It sought "a declaration that no member of the public has any right to use, possess or travel upon the Road."[3] *Id.* It also sought preliminary and permanent injunctions barring the County from requiring it to remove its gate.

The County moved to dismiss the case based on the Ranch's failure to name the United States as a defendant. But rather than dismiss the case, the state court ordered the Ranch to join the United States as a necessary party to the suit, reasoning that the United States had an interest in the litigation because the road accessed BLM land. After the Ranch amended its complaint to include the United States as a defendant, the County filed its answer and four counterclaims seeking (1) a declaration that the roads are public under R.S.

---

[3] The parties' briefing and the record sometimes loosely use the terms "owns" and "public roads." *See, e.g.*, Opening Br. 16 ("These two claims, the district court held, made the roads 'public in their entirety.'"); *see also* Resp. Br. 3 ("These Roads are public because they have existed since approximately 1884."). To avoid any confusion, we now simply note that "[a] right of way is not tantamount to fee simple ownership of a defined parcel of territory. Rather, it is an entitlement to use certain land in a particular way." *SUWA*, 425 F.3d at 747; *Barnard v. Gaumer*, 361 P.2d 778, 780 (Colo. 1961) ("An easement does not carry any title to the land over which it is exercised and the easement does not work a dispossession of the landowner.").

2477 and section 43-2-201(1)(e) of the Colorado Revised Statutes; (2) a declaration that the roads are public by dedication;[4] (3) a declaration that the roads are public by adverse use;[5] and (4) preliminary and permanent injunctions preventing the Ranch from blocking access to the roads.[6]

BLM removed the case to federal court under the federal-officer removal statute. *See* Appellant's App. vol. 1, at A26 ("Removal of this action is proper under 28 U.S.C. § 1442(a)(1), which authorizes the removal of any 'civil action' commenced in state court against, *inter alia*, the 'United States or any agency thereof.'"). Throughout the district-court proceedings, the Ranch never requested remand or challenged federal subject-matter jurisdiction. After discovery, and after the district court denied the parties' cross-motions for

---

[4] The Second Counterclaim alleges that a petition submitted on August 6, 1928, by five area landowners and five other area residents made the road public through common-law dedication.

[5] The Third Counterclaim alleges that the roads became public under the public-prescriptive-use statute, section 43-2-201(1)(c) of the Colorado Revised Statutes.

[6] The County later identified another legal theory in support: that the roads were public under section 43-1-202 of the Colorado Revised Statutes. *See* Appellant's App. vol. 1, at A229–30; Appellant's App. vol. 2, at A326, A343, A396. Section 43-1-202 provides that "[a]ll roads and highways which are, on May 4, 1921, by law open to public traffic shall be public highways within the meaning of this part 2."

summary judgment, the case proceeded to a bench trial in October 2020. *High Lonesome Ranch*, 508 F. Supp. 3d at 809.[7]

The bench trial lasted five days. *Id.* Despite remaining a party, the United States didn't participate; its attorneys attended the trial, but they "just . . . s[a]t there and watch[ed]." Appellant's App. vol. 3, at A635. After the trial, the parties submitted proposed findings of fact and conclusions of law. Based on the trial record and the parties' filings, the district court ruled for the County on two of its claims: R.S. 2477 and adverse use under Colorado law.[8] *High Lonesome Ranch*, 508 F. Supp. 3d at 831–40. The district court held that between these two modes of establishing rights-of-way, the roads were "public in their entirety." *Id.* at 846.

For most portions of the disputed roads, the district court ruled that public use between 1905 and 1917 established R.S. 2477 rights-of-way in the Dry Fork Valley. *Id.* at 834. The district court determined that the County had established R.S. 2477 rights-of-way "along most of North and Middle Dry Fork

---

[7] Before trial, The High Lonesome Ranch LLC became the named plaintiff after the original plaintiffs, #22 Enterprises LLC and #20 Enterprises LLC, merged into their parent entity.

[8] R.S. 2477 allows the creation of public rights-of-way over public land. *Kane County v. United States*, 772 F.3d 1205, 1219 (10th Cir. 2014) ("R.S. 2477 rights-of-way can only be established over public lands not reserved for public uses." (cleaned up)). So for any sought rights-of-way not in existence while the land was part of the public domain, the claimants must rely on Colorado adverse-use law.

Roads running westward." *Id.*[9] And the court found that the rights-of-way sufficiently tracked the roads as they exist today, and "the deviations in these roads throughout their over one-hundred-year existence are minor and the obvious result of natural changes in the landscape and the changing needs of settlers along the roads as they extended." *Id.* at 836. Yet the court acknowledged that "gaps" existed in the R.S. 2477 segments where the privately owned land in the early 1900s preceded the County's claimed R.S. 2477 rights-of-way. *Id.* at 834–35. Even so, it ruled that the County had shown adverse use of these gaps. *Id.* at 840 ("The part of North Dry Fork Road created by public prescriptive use runs through all of the 'gaps' in the R.S. 2477 right-of-way . . . ."). So the district court concluded that the gaps didn't matter because "the entirety of Middle Dry Fork Road, and North Dry Fork Road from the current locked gate location to the Y [where Middle Dry Fork Road branches off], became public by 1949 through adverse use." *Id.*[10]

---

[9] The district court reached the same conclusion under the County's theory based on section 43-1-202 of the Colorado Revised Statutes. *High Lonesome Ranch*, 508 F. Supp. 3d at 842–43 ("Here, the only law that could have rendered North and Middle Dry Fork Roads public by 1921 is R.S. 2477. I conclude that these roads were also public on May 4, 1921 under § 43-1-202 to the extent that R.S. 2477 rights-of-way had been created by that date . . . ." (footnote omitted)).

[10] Finding "no clear evidence of intent to dedicate [the land] by any landowner," the court ruled against the County on its Second Counterclaim, common-law dedication. *High Lonesome Ranch*, 508 F. Supp. 3d at 840–42.

During trial, the Ranch also argued that even if the County established its claimed rights-of-way, it had abandoned them. If it had abandoned them, the roads would have reverted to a private status. *Id.* at 843 (citations omitted). The district court agreed that a "presumption of abandonment" applied because the County had treated the roads as private for decades. *Id.* at 843–44. But it found no abandonment because the Ranch hadn't shown that the County had intended to abandon the rights-of-way. *Id.* at 844–46.

To arrive at its legal conclusions, the district court made many factual findings about the history and extent of public use of the roads. It based its findings on (1) government records, (2) community life, and (3) commercial activity. We provide some of the district court's extensive findings below.

### Government Records

*Land Patents in the Late 1800s.* The land on which the roads now lie became public in 1882, when President Arthur terminated the Ute Indian Reservation. *Id.* at 813. Nine years later, the United States began issuing cash-entry patents and homestead patents. *Id.* Cash-entry patents "required the buyer to pay cash for the land in exchange for the patent." *Id.* Homestead-entry patents required patentees to live on the property for at least five years, cultivate crops, and improve the land. *Id.* at 813–14. The government issued patents from 1891 to 1940. *Id.* The patent documents show that Peter Becker and Clifford Young lived on their land and used the roads to access their properties. *Id.* at 814, 822. Clifford Young's property passed to Lew Young in

13

July 1940, and Becker's property passed to Lew Young in March 1941. *Id.* at 822. Lew Young's daughter Dixie grew up on their ranch. *Id.* She later wrote a book about her childhood that included a 1928 picture showing her there at about age six or seven. *Id.* Dixie recalled seeing hunters there each year and going with family to De Beque for supplies. *Id.*

*Tax Records.* From 1892 to the 1940s the County tax assessor drove these roads to learn about the properties. *See id.* at 815. He recorded details, including land ownership, livestock, and personal possessions. *Id.*

*Surveys.* In 1884 and 1885, the GLO surveyed the Dry Fork area. *Id.* at 813. The surveys showed an Indian trail along part of the same route as the current roads, with the entire trail being immediately adjacent to the north side of Dry Fork Creek. *Id.* at 813, 833. Between 1925 and 1926, the GLO resurveyed the Dry Fork area. *Id.* at 816. These resurveys identify nearly all of North and Middle Dry Fork Roads. *Id.* The resurveys also reference an abandoned sawmill, three cabins, a house, a telephone line, and fencing along the roads. *Id.*

*U.S. Census Records.* Census records from the 1930s documented families living in the Dry Fork area. *Id.* at 823. They included "the Johns, Walkers, Masters, Barrows, Galyeans, and Sissoms." *Id.* But it wasn't clear to the district court where in the Dry Fork area these residents lived based on the Census data. *Id.*

14

*1928–1929 County Petition.* In August 1928, area landowners petitioned Garfield County to establish the roads as public and maintain them. *Id.* at 820. The County appointed a group of road viewers to create a report on the practicality of creating public roads. *Id.* Despite at first concluding that creating public roads would be impractical, the County reversed its position on September 5, 1929, and declared North Dry Fork Road a public road from its intersection with South Dry Fork Road west to the Y. *Id.* at 820, 837. That same month, the County surveyor mapped the road and gave notice of a public hearing to be held on September 17. *Id.* at 820. In a resolution, the Commission stated that the roads were public and had been used "for public travel, without interruption or objection . . . for more than twenty consecutive years . . . in fact for about forty consecutive years." *Id.* at 821. The district court found that the 1929 resolution supported the adverse-use finding because it showed that the roads were used overtly by the public, that private landowners had notice of the roads' public status, and that they didn't object within the statutory period. *Id.* at 837–39.

### Community Life

*Post Office.* Historically, the only post office near the present Ranch was in De Beque. *Id.* at 816. And to get there, residents had to travel on the Dry Fork roads. *See id.* From this, the district court logically concluded that these residents must have used the roads. *Id.*

15

*Books Detailing Settlers' Lives and School Records.* The district court found that books from the 1920s "provide ample evidence that the roads were used frequently during this period." *See id.* at 816–17. The court also found that some children likely walked on the roads as the most direct route to the Dry Fork Schoolhouse. *Id.* at 822–23.

### *Commercial Activity*

*Oil-Shale Mining.* The district court reviewed records of oil-shale-mining activities that would have required use of the roads. *Id.* at 817–18. The district court logically concluded that "the Oil Shale Mining Company used these roads to bring equipment to build the [oil shale] retort, cookhouse, tramway, and bunkhouse and that their laborers used the roads to travel to and from the mines throughout this period." *Id.* at 819.

*Sawmills.* The district court reviewed records from the late 1930s and early 1940s showing that people had operated a sawmill in the North Dry Fork Canyon and transported logs on the roads to De Beque. *See id.* at 823.

*Cattle Ranching.* The district court heard testimony from members of the Beach family about their use of the roads. *Id.* at 824. In 1959, the Beach family purchased some land from Lew Young and maintained cattle operations in North and Middle Dry Fork Canyons. *Id.* Mr. Beach lived at their property every summer between 1959 and 1971. *Id.* The Beaches trucked their calves along North Dry Fork Road, and the family drove on the roads weekly to De Beque for groceries. *Id.* Mr. Beach described unlocked gates along the roads for

cattle control. *Id.* He testified that "[m]embers of the public who traveled on the roads past these gates typically asked for permission," but they were likely being "polite." *Id.* All in all, the Beach family "accessed the property via [one of the] Dry Fork Road[s]." *Id.* at 824–25.

\* \* \*

Based on the presented evidence, the district court held that the roads were public and not abandoned. *Id.* at 846. It ordered the Ranch "to remove all gates along [the roads], along with any padlocks, chains, or other locking devices, and to remove signage indicating or suggesting that the road is private or that members of the public may not access and use it." *Id.* The Ranch's appeal followed.[11]

## DISCUSSION

On appeal, the Ranch raises six challenges: (1) that the district court lacked subject-matter jurisdiction; (2) that the district court erred in applying Colorado adverse-use law; (3) that the Colorado Court of Appeals previously adjudicated the same roads as being private in *Enerwest, Inc. v. Dyco Petroleum Corp.*; (4) that the district court misapplied R.S. 2477; (5) that the district court failed to adequately describe the location and width of the County's rights-of-

---

[11] The United States also appealed, but it dismissed its appeal two months later. Then, in June 2021, the United States filed a notice of nonparticipation and characterized the dispute as between only the County and the Ranch.

17

way; and (6) that the district court misapplied the Colorado presumption of abandonment. We address these arguments in turn.

## I.    Subject-Matter Jurisdiction

On three bases, the Ranch contends for the first time on appeal that the district court lacked subject-matter jurisdiction. First, it argues that in bringing Quiet Title Act ("QTA") crossclaims against BLM, the County failed to satisfy the QTA's jurisdictional prerequisites for waiver of the United States' sovereign immunity. Second, it argues that the County brought those crossclaims after the QTA's statute of limitations expired. Third, it challenges removal jurisdiction under a doctrine called derivative jurisdiction. Our review is de novo. *Leathers v. Leathers*, 856 F.3d 729, 749 (10th Cir. 2017) (citation omitted).

### A.    QTA Sovereign-Immunity Waiver

The United States is immune from suit unless Congress has expressly waived its sovereign immunity. *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 280 (1983) (citations omitted). Congress did just that in the QTA. *Id.* As the "exclusive means by which adverse claimants [can] challenge the United States' title to real property," *id.* at 286, the QTA permits plaintiffs to sue the United States "to adjudicate a disputed title to real property in which the United States claims an interest," 28 U.S.C. § 2409a(a).

Why is the QTA relevant here? Early in the litigation, the state trial court ordered the Ranch to join the United States as a necessary party because the roads "provide[d] access to" BLM land. Appellant's App. vol. 1, at A68. After

18

the Ranch amended its complaint to add the United States as a defendant, the County filed its answer and asserted counterclaims against the Ranch and the United States for a declaration that the disputed roads were "public roads." *Id.* at A77–87; *High Lonesome Ranch*, 508 F. Supp. 3d at 809 ("The county then asserted counterclaims against the Ranch *and the BLM* asking the court to declare that the roads are public." (emphasis added)).[12] After being joined, the United States promptly removed the case to federal court under § 1442, the federal-officer removal statute. In its notice of removal, the United States construed the County's crossclaims as not only affecting the portions of the roads on the Ranch's land, but also targeting the roads on interspersed BLM land. *Id.* at A26 ("The portions of road that the County seeks to have declared public include roadways that cross BLM land and connect with roads owned and controlled by BLM."). The United States then cited the QTA and federal courts' exclusive jurisdiction over those claims. It later answered the Ranch's complaint and the County's crossclaims.

Though the County didn't specify that its crossclaims were QTA claims, we "'focus on the relief . . . request[ed],' rather than on the party's characterization of the claim." *Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966, 975 (10th Cir. 2005) (alterations in original) (citation omitted).

---

[12] Though not styled as such, the County's allegations against the United States are crossclaims. *Cross-Claim*, *Black's Law Dictionary* (11th ed. 2019) ("[a] claim asserted between codefendants").

19

Because the County sought an R.S. 2477 right-of-way over BLM land, which can be accomplished only under the QTA, we construe the County's crossclaims as QTA claims. That's certainly how the parties and the district court interpreted them.

Confirming that the QTA is implicated here, we turn to the Ranch's jurisdictional argument. From the QTA's text, we have imposed two requirements for federal jurisdiction: (1) the United States must "claim[] an interest" in the property, and (2) the property's title must be "disputed." *Kane County*, 772 F.3d at 1210–11. The Ranch argues that the County failed to make these showings, meaning that the United States' sovereign immunity bars the County's crossclaims.

We note that the Ranch contests the second element while all but conceding the first. This comes as no surprise. After all, BLM owns some of the land across which North and Middle Dry Fork Roads lie—it obviously "claims an interest" in its own land. We thus focus on the second element, which we outlined in *Kane County*. To satisfy that element, "a plaintiff need not show the United States took direct action to close or deny access to a road—indirect action or assertions that actually conflict with a plaintiff's title will suffice." *Id.* at 1212. It's also enough for the plaintiff to show that the United States has "previously disputed a plaintiff's title" even if it "does not do so presently." *Id.* (citation omitted). But "actions of the United States that merely produce some ambiguity regarding a plaintiff's title" do not meet the standard. *Id.*

20

The Ranch highlights the United States' inconsistent stances during this litigation. It correctly notes that BLM has vacillated between opposing the crossclaims, supporting them, or taking no position at all. At best, the Ranch argues, these actions are ambiguous and defeat jurisdiction. In response, the County points to BLM's notice of removal and crossclaim answer to show that BLM disputed the County's R.S. 2477 right. We agree with the County. In its notice of removal, BLM contended that the County wanted public access over the roadways that crossed BLM land. Appellant's App. vol. 1, at A25–26. BLM also characterized the crossclaims as QTA claims, strongly implying that it was disputing the County's R.S. 2477 right across BLM's stretches of the roads. *See id.* at A26. And in its crossclaim answer, BLM admitted that it had not "vacated or abandoned the Roads." *Id.* at A82; Appellee's Suppl. App. vol. 1, at SA9.

Further, BLM asked the court to deny "[t]he relief requested by the County . . . to the extent that the County's [cross]claim fails to state a claim against BLM upon which relief can be granted." Appellee's Suppl. App. vol. 1, at SA11. Though it may have later changed course, BLM's litigation posture at the outset qualifies as "indirect action[s] or assertions that actually conflict with [the County's] title." *Kane County*, 772 F.3d at 1212. We conclude that the QTA's jurisdictional requirements were satisfied and discern no sovereign-immunity problem.

**B.    Statute of Limitations**

The Ranch next argues that "assuming the BLM does claim an interest in the roads, the County cannot satisfy the [QTA's] [twelve-year] statute of limitations." Opening Br. 33; 28 U.S.C. § 2409a(g). The limitations period under the QTA commences when the United States claims to have "exclusive control of a road." *Kane County*, 772 F.3d at 1215 (cleaned up). But the limitations period doesn't begin until the United States "provide[s] a county or state with sufficient notice of the United States' claim of a right to exclude the public." *Id.* at 1216 (internal citation and quotations omitted). That never happened here. The Ranch's only argument is that "[t]he limitations period has an 'exceedingly light' trigger, requiring only reasonable awareness that the Government claims some interest in the property." *See* Reply Br. 13 (citing *Kane County*, 772 F.3d at 1210–11, 1215). The Ranch doesn't explain what gave (or would have ever given) the County the needed reasonable awareness here. We thus reject the statute-of-limitations challenge.

**C.    Derivative-Jurisdiction Doctrine**

The Ranch's final argument concerns the derivative-jurisdiction doctrine, which generally provides that federal courts lack jurisdiction if the state court lacked jurisdiction before removal. *Lambert Run Coal Co. v. Balt. & Ohio R.R. Co.*, 258 U.S. 377, 382 (1922). As the Supreme Court phrased it a century ago, "[i]f the state court lacks jurisdiction of the subject-matter or of the parties, the

federal court acquires none, although it might in a like suit originally brought there have had jurisdiction." *Id.* (citations omitted).

This doctrine has been "heavily criticized" for its inefficiencies. 14C Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Joan E. Steinman & Mary Kay Kane, *Federal Practice and Procedure* § 3721.1 (rev. 4th ed. 2018) (collecting cases). To promote sound judicial administration, Congress in 1986 abolished the concept of derivative jurisdiction for cases removed under the general removal statute, 28 U.S.C. § 1441. Judicial Improvements Act of 1985, Pub. L. No. 99-336, § 3, 100 Stat. 633, 637 (1986) (current version at 28 U.S.C. § 1441(f)). And Congress did so again in 2002 using similar language in § 1441(f). Multiparty, Multiforum Trial Jurisdiction Act of 2002, Pub. L. 107-273, § 11020, 116 Stat. 1758, 1827 (codified at 28 U.S.C. § 1441(f)). But for no clear reason, the 2002 amendment limited its abolition of derivative jurisdiction to cases removed under § 1441, not those removed under other sections like § 1442, the federal-officer removal statute. *See id.*

BLM chose to remove under § 1442, so the derivative-jurisdiction doctrine applies. Federal district courts have "exclusive original jurisdiction" over QTA claims. 28 U.S.C. § 1346(f). This means that the County's QTA crossclaims must have originally been brought in federal court; removal wasn't an option. *See id.*; *California v. Arizona*, 440 U.S. 59, 68 (1979) (concluding that the QTA "assure[s] that . . . jurisdiction was not conferred upon the courts of any State"). Because the state trial court never had jurisdiction over these

23

crossclaims, upon the United States' § 1442 removal, "the federal court acquire[d] none." *Lambert Run Coal Co.*, 258 U.S. at 382.

But the Ranch never raised this jurisdictional flag before the district court. Though parties can attack subject-matter jurisdiction even after a final judgment, *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434–35 (2011) (citation omitted), many courts have held that derivative jurisdiction is a procedural bar and doesn't concern Article III subject-matter jurisdiction, *see Fed. Home Loan Mortg. Corp. v. Gilbert*, 656 F. App'x 45, 52–53 (6th Cir. 2016) (Sutton, J., concurring) (collecting cases from the First, Third, Fifth, Sixth, Seventh, and Ninth Circuits). If derivative jurisdiction is only a procedural bar, it is waivable. *Rodas v. Seidlin*, 656 F.3d 610, 623 (7th Cir. 2011).

The view of derivative jurisdiction as a procedural bar comes from the Supreme Court's decision in *Grubbs v. General Electric Credit Corp.*, 405 U.S. 699 (1972). There, the Supreme Court dealt with a case that had been improperly removed and then tried to judgment on the merits without objection. *Id.* at 700–02. The Court held that a party waives its right to later litigate the propriety of removal jurisdiction if it fails to raise the issue at removal. *Id.* at 702–03; *see also Rodas*, 656 F.3d at 619 (noting that derivative jurisdiction "is best understood as a procedural bar" to exercising subject-matter jurisdiction rather than "an essential ingredient to federal subject matter jurisdiction").

24

The seminal derivative-jurisdiction case among the circuits is *Rodas*. In *Rodas*, a plaintiff sued a community-health center, a hospital, and three physicians in Illinois state court for negligently managing her childbirth. 656 F.3d at 612–13. Because the defendants received federal funds, the United States could substitute itself as a defendant, and the claims would be governed by the Federal Tort Claims Act. *Id.* After some procedural tumult, the plaintiff sued the United States directly. *Id.* at 614. The United States then removed the case under § 1442, and the case progressed to judgment for the physicians. *Id.* The plaintiff appealed, but after the district court entered judgment, the United States moved to dismiss under the derivative-jurisdiction doctrine, which the district court denied. *Id.* On appeal, the United States raised derivative jurisdiction again. *Id.* at 615.

After determining that removal under § 1442 was proper and that the derivative-jurisdiction doctrine applied, the Seventh Circuit turned to evaluate how to treat derivative jurisdiction. *Id.* at 619. It discussed *Grubbs*, *Caterpillar Inc. v. Lewis*, 519 U.S. 61 (1996), and *Grupo Dataflux v. Atlas Global Group*, 541 U.S. 567 (2004), and ultimately rejected the United States' position that derivative jurisdiction created a latent subject-matter-jurisdiction defect. *Id.* at 619–22. First, the court distinguished removal jurisdiction from subject-matter jurisdiction and held that removal jurisdiction isn't jurisdictional but is a "*means* of bringing cases within federal courts' original jurisdiction." *Id.* at 622–23 (quoting 14B Charles Alan Wright, Arthur R. Miller, Edward H.

25

Cooper & Joan E. Steinman, *Federal Practice and Procedure* § 3721 (4th ed. 2009)). Second, it noted that derivative jurisdiction relates to removal jurisdiction. *Id.* at 623 (listing cases). Third, the court analyzed early derivative-jurisdiction caselaw and noted that the doctrine was treated flexibly. *Id.* at 623–24. Fourth, it categorized derivative jurisdiction as being "rooted in the idea that there is no case at all," rather than in the court's power to hear a case. *Id.* at 624. From this, the Seventh Circuit concluded that despite "its perhaps improvident name," derivative jurisdiction is a procedural bar and is thus waivable. *Id.* at 625. Under *Grubbs* and *Caterpillar*, the test is whether "the district court would have had jurisdiction over a hypothetical complaint filed at the time it entered the judgment now under review." *Id.* Because the district court would have had jurisdiction under the Federal Tort Claims Act had the case been originally filed in federal court, "the fact that the state court lacked jurisdiction over the case when it was removed ha[d] no significance." *See id.*

The Ranch asks us to disregard *Rodas* as incompatible with the "jurisdictional character of sovereign immunity." Reply Br. 11. Yet the Ranch fails to appreciate that *Rodas* itself involved sovereign immunity (related to the Federal Tort Claims Act) and still managed to harmonize the cases that the Ranch cites. *Rodas*, 656 F.3d at 616, 619–21. The Ranch also insists that *Rodas* conflicts with *Crow v. Wyoming Timber Products Co.*, 424 F.2d 93, 96 (10th Cir. 1970). But *Crow* didn't involve waiver. And *Crow* predated *Grubbs*, which

26

clarified that after a final district-court judgment the propriety of removal isn't an issue—instead, all that matters is the existence of original district-court jurisdiction. *Grubbs*, 405 U.S. at 702 ("Longstanding decisions of this Court make clear . . . that where after removal a case is tried on the merits without objection and the federal court enters judgment, the issue in subsequent proceedings on appeal is not whether the case was properly removed, but whether the federal district court would have had original jurisdiction of the case had it been filed in that court.").[13]

Had the County originally brought its QTA crossclaims in a federal-court case, the district court would have had original jurisdiction under the QTA, so the crossclaims meet *Grubbs*'s test. *See* § 1346(f). As Wright and Miller remarked, *Rodas* presents the "better view" of derivative jurisdiction. 14 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Helen Hershkoff, *Federal Practice and Procedure* § 3655 (4th ed. 2015). We agree with *Rodas* and join the six circuits that hold that derivative-jurisdiction issues are waivable. Because the Ranch never challenged the district court's

---

[13] The Ranch argues that *Grupo Dataflux* requires that in cases involving derivative jurisdiction, federal courts cannot assert subject-matter jurisdiction without it. But *Grupo Dataflux* concerned diversity jurisdiction. The parties weren't diverse when the case was filed but became so by judgment because in the interval a party's citizenship changed. The Supreme Court held that under the "time-of-filing rule," subject-matter jurisdiction must exist when a case is filed. 541 U.S. at 570–71. *Grupo Dataflux* says nothing about whether the derivative-jurisdiction doctrine is a subject-matter-jurisdiction issue or a procedural defect.

jurisdiction under the derivative-jurisdiction doctrine until this appeal, it has waived the argument.

*    *    *

Though removal here was improper, the Ranch waived its protest by waiting until this appeal to broach the subject. With the district court's subject-matter jurisdiction verified, we turn to the merits of the Ranch's appeal.

## II.    Public Prescriptive Use Under Colorado Law

The district court held that "the county has proven the roads are public by public prescriptive use" between 1929 and 1949 under section 43-2-201(1)(c) of the Colorado Revised Statutes.[14] *High Lonesome Ranch*, 508 F. Supp. 3d at 837–38. The Ranch argues that the district court's finding of public adverse use is erroneous and "contravene[s] constitutional principles." Opening Br. 35. We review the challenge to the district court's factual finding of adverse use for clear error. *Obeslo v. Great-W. Life & Annuity Ins. Co.*, 6 F.4th 1135, 1148

---

[14] Section 43-2-201(1) provides the legal standard for creating public highways over private lands in Colorado. The statute declares these to be "public highways":

> (c) All roads over private lands that have been used adversely without interruption or objection on the part of the owners of such lands for twenty consecutive years;
> . . .
> (e) All roads over the public domain, whether agricultural or mineral.

(10th Cir. 2021) (citation omitted).[15] We review the constitutional question de novo. *See United States v. Muhtorov*, 20 F.4th 558, 630 (10th Cir. 2021) (citation omitted), *cert. denied*, 143 S. Ct. 246 (2022).

### A. Adverse-Use Finding

Under section 43-2-201(1)(c) of the Colorado Revised Statutes, "[a]ll roads over private lands that have been used adversely without interruption or objection on the part of the owners of such lands for twenty consecutive years" are considered public highways. There are three elements to public prescriptive use: "(1) members of the public must have used the road under a claim of right and in a manner adverse to the landowner's property interest; (2) the public must have used the road without interruption for the statutory period of twenty years; and (3) the landowner must have had actual or implied knowledge of the public's use of the road and made no objection to such use." *Bd. of Cnty. Comm'rs v. Flickinger*, 687 P.2d 975, 980 (Colo. 1984) (citations omitted).

The district court applied the standard for showing public prescriptive use under section 43-2-201(1)(c) and found substantial evidence of public adverse use during the statutory period. *High Lonesome Ranch*, 508 F. Supp. 3d

---

[15] The Ranch seeks de novo review because it is challenging legal conclusions and mixed questions of law and fact that "primarily" involve "consideration of legal principles." Opening Br. 35 (citing *Roberts v. Printup*, 595 F.3d 1181, 1186 (10th Cir. 2010)). We read the Ranch's opening brief as challenging the district court's fact-findings by recharacterizing the strength of the evidence on which the court relied. We are therefore bound to apply the clear-error standard of review.

at 836–39. It was persuaded that the County's 1929 petition process showed that the public had used the roads for well over twenty years before 1929. *Id.* at 837–38. It explained that the 1929 resolution identified the entire length of Middle Dry Fork Road and much of North Dry Fork Road and notified property owners in the area to attend a county meeting if they wanted to object to the roads being public. *Id.* at 837. And because the 1929 resolution was "filed with the County Clerk and Recorder," the district court concluded that "[l]andowners thus knew about the road, and there is no evidence they objected to it." *Id.*

It also relied on abundant evidence that the public used the roads after the 1929 petition. *Id.* The district court found that the roads were used by patentees and their families. *See, e.g.*, *id.* at 837–38 ("In 1933 Peter Becker entered his patented parcel on Middle Dry Fork and began proving up. He used the road to reach his land through 1940 when he received his patent and until 1941 when he sold to Lew Young. During the 1940s Lew Young's family used the road to access their properties along both North and Middle Dry Fork Roads until they sold to the Beaches in 1959. They drove their car to and from [De Beque] and hosted hunters each year. At no point did the Court hear evidence that a landowner blocked any part of either road between 1929 and 1949."). The district court also found evidence of significant commercial activity. *See id.* at 837 ("Middle Dry Fork Road was in use from 1916 when the Oil Shale Mining Company began its operations. Mining claimants did yearly assessment work on claims in 1929 and 1930, using the road to access them.").

30

Based on all the evidence before it, the district court ultimately concluded that the roads "were continuously traveled for more than twenty years," which "trigger[ed] the adverse-use presumption." *Id.* at 838. But the court then held that adverse use existed even without the presumption because there were no recorded easements and no evidence of landowners objecting to the roads being public in county meetings. *Id.* ("Neither party found any record of easements among landowners to cross one another's land. No landowners or other interested parties objected to the road petition at the 1917 county meeting. The Court never heard evidence that any landowner subsequently objected to the public's use or tried to prevent others from traveling the roads between 1929 and 1949."). For those reasons, the court found adverse public use. *Id.* at 837–39.

The Ranch argues that the district court's adverse-use analysis conflates the requirements for creating a private easement with the requirements of creating a public highway. It contends that the district court relied on evidence of "obviously intermittent and permissive uses." Opening Br. 41. But arguing that the evidence supports a finding of permissive use doesn't make the district court's adverse-use findings clearly erroneous. The Ranch doesn't fully explain how the district court improperly weighed the public-use evidence. It also fails to point us to any cases reversing as clearly erroneous similar findings by district courts. *See Maralex Res., Inc. v. Chamberlain*, 320 P.3d 399, 404 (Colo. App. 2014) ("Whether use is adverse or permissive is a question of fact, and, as

31

such, is within the province of the fact finder." (citation omitted)). The "sufficiency, probative effect, and weight of the evidence, along with the inferences and conclusions to be drawn from such evidence, are all within the province of the trial court." *Id.* at 405–06. We thus reject the Ranch's argument.

The Ranch also argues that "the district court applied a 'presumption of adversity,'" Opening Br. 42, because it concluded that North and Middle Dry Fork Roads "were continuously traveled for more than twenty years," *id.* (quoting *High Lonesome Ranch*, 508 F. Supp. 3d at 838). The Ranch argues that applying this presumption was legal error because it "improperly placed the burden on the Ranch to disprove adversity." *Id.* at 41. But as discussed, the presumption of adversity wasn't necessary to the district court's finding. The district court said that "[e]ven without that presumption, the evidence before the Court proved that use of the roads was adverse." *High Lonesome Ranch*, 508 F. Supp. 3d at 838. In any event, we reject the Ranch's argument because it misapprehends Colorado law. In *Maralex Resources*, the Colorado Court of Appeals noted that courts may presume adversity if there is non-permissive use of land for the statutory period. 320 P.3d at 404 (citing *Brown v. Faatz*, 197 P.3d 245, 250 (Colo. App. 2008)). So the district court didn't err even if the presumption of adversity were necessary to its finding of adverse public use.[16]

---

[16] The Ranch also argues that the district court should have considered historical evidence of gates on the roads by prior landowners as showing only permissive use, not adverse use. *See* Opening Br. 44 (citing *McIntyre v. Bd. of*

**B.    Constitutional Taking**

The Ranch also argues that the district court's adverse-use finding "contravenes constitutional protections against uncompensated takings." Opening Br. 45. But the Ranch never develops a constitutional-takings argument. Reply Br. 15 n.9 ("[T]he Ranch does not assert [a takings argument] . . . [It] argues [only] that adverse use is constrained by constitutional principles."). It cites *Leo Sheep Co. v. United States*, 440 U.S. 668, 679–80 (1979), for the proposition that the Supreme Court has cautioned "that right-of-way doctrines cannot 'upset settled expectations to accommodate some ill-defined power to construct public thoroughfares without compensation.'" Reply Br. 15. The Ranch doesn't tell us what to do with such a proposition even if we agreed with it. Because it's unclear what relief the Ranch wants from our court, we decline to consider the Ranch's argument.

**III.    The *Enerwest* Decision**

The Ranch contends that in a 1986 decision, the Colorado Court of Appeals determined that North Dry Fork Road was private. *See* Opening Br. 9–10 (citing *Enerwest, Inc. v. Dyco Petrol. Corp.*, 716 P.2d 1130 (Colo. App. 1986)). In that case, Enerwest had purchased property that carried an easement to Dyco Petroleum Corporation. *Id.* at 1131. The easement gave Dyco the right

---

*Cnty. Comm'rs*, 86 P.3d 402, 412 (Colo. 2004)). As the district court concluded, "opening the gates and going through, without ever seeking permission, actually suggests *adverse* use." *High Lonesome Ranch*, 508 F. Supp. 3d at 838.

to use North Dry Fork Road up to the Y. Opening Br. Addendum D, at 153. Enerwest sued to prevent Dyco from using the road. *Enerwest*, 716 P.2d at 1131. Along with defending the easement, Dyco had also argued during trial that the road on the land was a public highway. *Id.* at 1132. But the trial court held that Dyco's use of the roads had been permissive rather than adverse. *Id.* The court of appeals agreed, concluding that "[t]he trial court's determination that the road in question had not become a public highway will not be disturbed on review" because there was "ample evidence" that any use was permissive, not adverse. *Id.* (citation omitted).

The Ranch asks us to give *Enerwest* preclusive effect against the County. But the County was not a party in *Enerwest*. On that basis, the district court declined to bind the County to the decision. *High Lonesome Ranch*, 508 F. Supp. 3d at 844–45 ("Normally it is the duty of the litigants or the court to join an indispensable party." (citing *Bittle v. CAM–Colo., LLC*, 318 P.3d 65, 69–70 (Colo. App. 2012))). The district court didn't err.

## IV. R.S. 2477

The Ranch argues that the district court lessened the County's burden to show that the public had accepted an R.S. 2477 right-of-way over the roads by "long-continued use" and "held the County to no significant burden." Opening Br. 46. The County responds that the Ranch is simply challenging the court's permissible use of circumstantial evidence to prove public use. We agree with

34

the Ranch that the district court's articulated R.S. 2477 standard was too lenient.

To establish an R.S. 2477 right-of-way, a party must show (1) a right-of-way over the public domain and (2) the public's acceptance of it by use. *See Wilderness Soc'y v. Kane County*, 632 F.3d 1162, 1165–66 (10th Cir. 2011) (en banc). The district court correctly noted that "federal law governs the interpretation of R.S. 2477, but that in determining what is required for acceptance of a right of way under the statute, federal law 'borrows' from long-established principles of state law, to the extent that state law provides convenient and appropriate principles for effectuating congressional intent." *High Lonesome Ranch*, 508 F. Supp. 3d at 831 (quoting *SUWA*, 425 F.3d at 768). But "to the extent state law is borrowed in the course of interpreting R.S. 2477, it must be in service of federal policy or functions[] and cannot derogate from the evident purposes of the federal statute." *SUWA*, 425 F.3d at 763 (internal quotation marks omitted).

In identifying the R.S. 2477 standard for acceptance, the district court recited the standard in *Brown v. Jolley*, 387 P.2d 278, 281 (Colo. 1963) (in department). *High Lonesome Ranch*, 508 F. Supp. 3d at 832. There, a three-justice panel for the Colorado Supreme Court declared that such acceptance "results from 'use by those for whom it was necessary or convenient'" and suffices even "if the use be by only one." *Brown*, 387 P.2d at 281. Yet in the district court and on appeal, the parties failed to cite our later decision in *San*

35

*Juan County v. United States*, 754 F.3d 787 (10th Cir. 2014). There, we rejected Utah's and San Juan County's argument that acceptance required "no particular frequency of use," only public use "as often as the public finds convenient or necessary during the ten-year period." *Id.* at 797. We held that such a lenient standard departed from Congress's intent under R.S. 2477 in establishing a public thoroughfare. *Id.* Instead, we required an acceptance standard under which "[t]he intensity of public use remains a pertinent component." *Id.* at 799.

On this point, the district court did not cite or apply *San Juan County*. Instead, it merely applied Colorado's acceptance standard from *Brown* without addressing whether *Brown* "derogate[s] from the evident purposes of [R.S. 2477]." *SUWA*, 425 F.3d at 763. *Brown* contravenes congressional intent for the same reason we noted in *San Juan County*: The acceptance standard is too lenient. In divining congressional intent, we have turned to R.S. 2477's phrase "for the construction of highways." *San Juan County*, 754 F.3d at 799. A public-use standard requiring only that the use be "as often as the public finds convenient or necessary" departs from this R.S. 2477 phrase and thus from Congress's intent in enacting that statute. *See id.* As in *San Juan County*, adopting *Brown* as the applicable standard risks a right-of-way "spring[ing] into being at the most infrequent use of a path by a member of the public." *Id.*

Because the district court applied an acceptance standard out of step with *San Juan County*, we must reverse. Though we recognize that "it is difficult to crystallize in a verbal formula the precise level of use necessary for acceptance

36

of an R.S. 2477 right-of-way," *id.*, on remand, the district court should apply to the trial evidence an acceptance standard that accords with our guidance in *San Juan County*.

## V.    Scope of Rights-of-Way

The Ranch argues that the district court didn't sufficiently adjudicate the location and width of the roads. It insists that the roads be confined to a single and definite path. It points out that "for miles approaching the 'Y,' the roads sit in open range." Reply Br. 24. And the Ranch says that the roads vary by over half a mile from the historically traced routes on which the district court relied. This imprecision, the Ranch believes, requires us to vacate the district court's order and remand for a re-adjudication of the roads' precise locations. We review this argument for clear error because it challenges the district court's factual findings. *Obeslo*, 6 F.4th at 1148 (citation omitted).

The parties dispute the effect of *Weisiger v. Harbour*, 62 P.3d 1069, 1071 (Colo. App. 2002), on this issue. That case holds that minor deviations from historical routes will not defeat a claim of public use. *See id.* The Ranch argues that a half-mile change in the roads' route is not a minor deviation. It points out that *Weisiger* relied on cases treating deviations of 100 feet or less as minor— not deviations up to a half-mile. The Ranch is correct on this point, but it ignores another key statement from *Weisiger*: A deviation in the path of a prescriptive easement doesn't defeat a public-use claim when the deviation is caused by actions over which the claimant had no control. *Id.* at 1072 (citations

37

omitted). The Ranch doesn't contend that the County or its agents changed the historic route of the roads. In fact, the district court relied on evidence that the route changes largely came from natural washouts: "I have already found that the deviations in these roads throughout their over one-hundred-year existence are minor and the obvious result of natural changes in the landscape and the changing needs of settlers along the roads as they extended." *High Lonesome Ranch*, 508 F. Supp. 3d at 836. The County argues that the Ranch itself changed the roads' locations for its own convenience. The Ranch doesn't dispute this in its reply.

The district judge visited the disputed area and toured the roads. He drove along North and Middle Dry Fork Roads. He saw that these roads traveled through narrow canyons. Based on these observations and two historical surveys, the district court determined the location of the rights-of-way after a weeklong trial that included reviewing documents and testimony about the roads over the last century. *See High Lonesome Ranch*, 508 F. Supp. 3d at 840. Given the extensive effort invested in analyzing the evidence and confirming the descriptive testimony, we have no basis to declare the district court's adjudication of the rights-of-way to be clearly erroneous.

But we agree with the Ranch that the precise locations and widths of the rights-of-way aren't clear from the district court's opinion. To clarify the parties' rights and obligations, the district court should order a formal survey to

38

establish the dimensions of the rights-of-way. It may allocate costs as it sees fit.

## VI.    Presumption of Abandonment

Under the presumption-of-abandonment principle, public property is considered abandoned if a party provides evidence of nonuse and intent to abandon the property. *See Koenig v. Gaines*, 440 P.2d 155, 157–58 (Colo. 1968) (in department). The Ranch argues that the district court misapplied the law in its abandonment analysis.[17] It summarizes the district-court opinion as finding that (1) the County abandoned the roads but that (2) the presumption was overcome "without contrary evidence." Opening Br. 56. The Ranch insists that this "is not how presumptions work." *Id.* And it declares that "[o]nce the 'presumption of abandonment' is triggered, the party resisting abandonment has the 'duty of overcoming it.'" *Id.* (quoting *Monte Vista Bank & Tr. Co. v. Savage*, 225 P. 219, 220 (Colo. 1924)).

In fact, the district court correctly articulated the two elements of abandonment: "(1) intent to abandon and (2) nonuse." *High Lonesome Ranch*, 508 F. Supp. 3d at 843 (citing *Koenig*, 440 P.2d at 157–58). It then held that "[t]his forty-plus year period of non-use creates a presumption of abandonment.

---

[17] The County argues that a presumption of abandonment does not exist under Colorado law. The district court found that such a presumption does exist, and we agree. *See, e.g.*, *In re Protest of McKenna*, 346 P.3d 35, 42 (Colo. 2015) ("The common law has long defined abandonment as nonuse coupled with the owner's intent to relinquish his appropriation." (citing *Arnold v. Roup*, 157 P. 206, 209 (Colo. 1916))).

But this presumption can be, and indeed is, overcome." *Id.* at 844. Though the Ranch argues that this statement misapplies the presumption, it takes the court's statement out of context. The district court explained that though the Ranch could show nonuse of the roads under *Koenig*, that was just one necessary element to show abandonment. *Id.* at 843–44. The other necessary element is intent. *Koenig*, 440 P.2d at 157. And the district court stated that "[t]he Court finds that the Ranch *fails to prove* the first element of abandonment, *intent*." *High Lonesome Ranch*, 508 F. Supp. 3d at 844 (emphases added). It then rejected the evidence that the Ranch believes shows an intent to abandon—such as the County's failure to maintain the roads, failure to complain about the locked gates on the road, and failure to "identify the roads as public on maps." *Id.*

A fair reading of the district court's opinion shows that it didn't shift the burden of proof or misapply the abandonment presumption. To the contrary, the district court explained why the Ranch failed to show that the County intended to abandon the public nature of the roads: "The Court finds that the Ranch has carried its burden on the second element, nonuse. . . . The Court finds that the Ranch fails to prove the first element of abandonment, intent." *Id.* The district court found that this meant that the Ranch failed to prove abandonment. *See id.* at 844–45 ("Without more I will not assume the county believed the roads were private merely because the Ranch asks me to."). Because the Ranch's argument mischaracterizes the district court's opinion, it fails.

40

Even if the Ranch were correct that the County introduced no evidence to excuse its nonuse, and even if we looked past the Ranch's failure to show that the County intended to abandon the roads, we would still affirm. The district court correctly cited *Koenig* as providing the relevant standard to prove abandonment under Colorado law and applied the case by its terms. *Id.* at 843–45. So abandonment is a factual question. *Accord United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir. 1995) ("[A]bandonment of property is a factual finding . . . ." (citation omitted)). The district court weighed the evidence and found that the roads weren't abandoned as a matter of fact. *High Lonesome Ranch*, 508 F. Supp. 3d at 846. The Ranch points to no clear error in the district court's identification of the relevant evidence or how it weighed that evidence in finding that the roads weren't abandoned.

## CONCLUSION

For those reasons, we AFFIRM the district court's adverse-use ruling but REVERSE its R.S. 2477 ruling and remand for the court to reconsider that ruling under the *San Juan County* standard.[18] We also remand for the district court to determine the locations and widths of the rights-of-way by survey.

---

[18] On remand, the district court need reanalyze only the R.S. 2477 claim for the portion of North Dry Fork Road west of the Y.